UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL ROWE RUSSO,<br><br>                     Petitioner,<br><br>     v.<br><br>KEITH YORDY,<br><br>                   Respondent. | Case No. 1:17-cv-00232-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus filed by Idaho prisoner Michael Rowe Russo, challenging his state court convictions of rape, kidnapping, and burglary. (Dkt. 3.) The Petition is now fully briefed and ripe for adjudication.

The Court takes judicial notice of the records from Russo's state court proceedings, which have been lodged by Respondent. (Dkt. 14, 21.) *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006).

All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Dkt. 11.) Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying habeas corpus relief.

# BACKGROUND

Pursuant to 28 U.S.C. § 2254(e)(1), the following facts of Russo's case, as described by the Idaho Supreme Court, are presumed correct absent clear and convincing evidence to the contrary:

> In the predawn hours of August 27, 2009, a woman sleeping in the bedroom of her apartment in Nampa, Canyon County, Idaho, awakened to see an unknown male standing over her with a knife in his hand. He was wearing a mask that covered his face and exposed his eyes. He put a hand over her mouth and held a knife against her throat, and he then stated that she was going to cooperate. He initially attempted several sexual acts, but was unable to obtain an erection. He then had her lie on her back at the bottom of the bed, where he raped her. He wore a condom and used his cell phone to take photos of her during the rape. Before leaving, he took her sheets and a pillow case. He also had her remove the battery from her cell phone, and he placed it under clothing in her panty drawer. She ran to a neighbor's house, where she called 911. Defendant was immediately the focus of law enforcement.

> The Nampa police had been investigating Michael Russo (Defendant) for an assault and battery that had occurred in Nampa on August 21, 2008 [which had also involved a male intruder with a knife]….[1]

> ….

> After the Nampa police responded to the victim's apartment in this case and spoke with the victim, Defendant became the focus of their investigation. They contacted the Meridian police, who sent an officer to Defendant's

---

[1] During the investigation of the 2008 assault and battery, police had learned that Russo "had been convicted of rape in Washington in 1995 and was a registered sex offender." *State v. Russo*, 336 P.3d 232, 235 (Idaho 2014). Police had also interviewed Russo, who was found near the scene of that crime; Russo admitted "that he fantasized about raping a girl who would get turned on during the rape and decide she liked it; that he fantasized about being dominant over someone; and that he still struggled with issues involving aggression and sexual boundaries." *Id*. at 236. Russo had also consented to a search of his computer, which "contained several videos of women being violently raped, and some of the search criteria in the computer included rape fantasies." *Id*. at 235.

apartment in Meridian, Ada County, Idaho. When the officer arrived there at 5:47 a.m., the lights were on in the apartment. He confirmed that Defendant was inside the apartment, and he checked Defendant's motorcycle that was parked outside and determined that the engine was still warm. The Meridian officer stayed outside Defendant's apartment for about an hour and left when he was relieved by Detective Deborah Cain of the Nampa Police Department. Another Nampa officer later arrived at about 8:30 a.m., and they both kept the apartment under surveillance.

[Nampa Police Department] Corporal Weekes[, who had been involved in the investigation of the 2008 assault and battery,] contacted Detective Ray Ellis of the Meridian Police Department and asked him to obtain a search warrant from a judge in Ada County, and he did. In his affidavit, Detective Ellis provided the information described above; information concerning the rape of a young woman working as a barista in Fruitland, Idaho, on July 8, 2009, and Defendant's conduct at that coffee shop the day and evening before the rape; and information concerning Defendant's 1995 rape of a young woman working as a barista at a coffee shop in Washington. On August 27, 2009, at 11:10 a.m., the magistrate judge issued a search warrant authorizing the police to search Defendant's residence and motorcycle and to seize, as evidence of the crime of rape, certain described items that may be located in those places, including a cellular phone. As soon as Detective Ellis had obtained the search warrant, he informed Corporal Weekes that the warrant had been issued, and he then proceeded to Defendant's apartment with the warrant. Corporal Weekes and two other Nampa detectives then headed to Defendant's apartment.

At about 11:50 a.m., Detective Cain saw Defendant leave his apartment and walk to his mailbox. She called Corporal Weekes, and then she and the other Nampa officer detained Defendant at his mailbox. Corporal Weekes performed a patdown search of Defendant and removed his wallet and a cell phone from his pockets. She told him that he was not being arrested but was being detained for investigation, and she handcuffed him and placed him in a patrol car. About five minutes later, Detective Brice King of the Nampa Police Department arrived, and Corporal Weekes

gave him the cell phone. He looked through what was stored on the phone and saw a video of a condom-covered penis penetrating a shaved vagina. He then turned the phone off.

The officers searched Defendant's apartment pursuant to the warrant, and they found, among other items of evidence, two cell phones. Later that afternoon, Detective Ellis went back to the magistrate court to obtain an amended search warrant for the search of the two cell phones found in Defendant's apartment and the cell phone taken from his person. He presented to the court an amended affidavit, which included all of the information contained in the initial affidavit and additional information, including the statement: "Additionally, a cellular phone was recovered from Mr. Russo's person during a pat down search for officer safety. This phone was opened and looked at to determine ownership. Your affiant knows that a video was located on that phone that appears to depict the victim from this morning's rape." Based upon the amended affidavit, the magistrate judge issued a search warrant on August 27, 2009, at 3:15 p.m. authorizing the search of the three cell phones.

Defendant was indicted …. Prior to his trial, he moved to suppress various items of evidence including the video found on the cell phone that was on his person. The district court denied his motion to suppress. [The cell phone video was presented at trial as Exhibit 49.] During the … trial, the victim's gynecologist testified that the victim was the woman in the video [introduced as Exhibit 49] based upon various physical characteristics of [the victim's] vaginal area.[2]

*State v. Russo*, 336 P.3d 232, 235–37 (Idaho 2014).

---

[2] In addition to this identification by the victim's gynecologist, the victim identified herself as the female in a video that Detective King had shown to her; the victim testified she knew that she was the female in the video because "I know my vagina, and I know just how I am. I just knew it was me." (State's Lodging A-11 at 226.) However, because the victim testified *before* the video was introduced—it was introduced later during Detective King's testimony—the victim did not have the opportunity to identify the video she was shown, and in which she identified herself, as the *same* video as the video found on Russo's cell phone. Respondent has not contested Russo's argument that the victim's testimony did not actually link the video she saw herself in to Exhibit 49, the video found on Russo's cell phone.

Russo testified in his own defense. He claimed that the woman in the video was not the victim, but a woman with whom he had consensual sex that night. Russo stated he had met the woman at a bar in Meridian called The New Frontier, that her name was Melissa or Michelle, and that he took the video on his cell phone during their sexual encounter because he did not think he would remember the encounter the next day. (State's Lodging A-12 at 114-18.)

The jury found Russo guilty of rape, first-degree kidnapping, and burglary. Russo appealed, arguing that the trial court should have suppressed the cell phone video and excluded certain Rule 404(b) evidence as to Russo's deviant sexual interests. (State's Lodging B-2.) The Idaho Court of Appeals affirmed, and the Idaho Supreme Court granted review. (State's Lodging B-6, B-9.) The state supreme court also affirmed Russo's convictions, holding that the cell phone video was admissible under the independent source doctrine and that the trial court did not abuse its discretion in admitting the Rule 404(b) evidence. *Russo*, 336 P.3d at 235.

Russo returned to the trial court and filed a post-conviction petition asserting numerous claims. (State's Lodging C-1 at 4-14.) The state district court dismissed the petition. (*Id*. at 139-62.) Russo appealed, asserting three claims of ineffective assistance of counsel ("IAC"). The Idaho Court of Appeals affirmed the dismissal of the post-conviction petition on the merits, and the Idaho Supreme Court denied review. (State's Lodging D-4; D-6.)

In his federal Petition, Russo asserts the following three ineffective assistance of counsel (IAC) claims, all of which were raised on appeal from the dismissal of Russo's state post-conviction appeal: (1) trial counsel should have filed a pretrial motion to exclude expert testimony of the victim's gynecologist, Dr. Lisa Minge, in which Dr. Minge identified the victim as the woman in the cell phone video "beyond a degree of medical certainty" (State's Lodging A-13 at 92, 94); (2) trial counsel should have moved for a judgment of dismissal or acquittal based on insufficient evidence; and (3) direct appeal counsel should have appealed the trial court's decision to overrule trial counsel's mid-trial objection to the doctor's identification of the victim as the woman in the cell phone video. (Dkt. 3-1, Att. B.)

For the following reasons, the Court concludes that Russo is not entitled to habeas relief.

## DISCUSSION

### 1. Habeas Corpus Standard of Law

Federal habeas corpus relief may be granted when a federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief may be granted only where the state court's adjudication of the petitioner's claim:

> (1)     resulted in a decision that was contrary to, or
>          involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Deciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons— both legal and factual—why state courts rejected a state prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (internal quotation marks and citations omitted).

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. This section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*,

529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis omitted).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If there is any possibility that fair-minded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* To be entitled to habeas relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of

Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Therefore, evidence that was not presented to the state court cannot be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determinations of the state court were reasonable. *See Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014); ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2)."); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that the adjudication of a claim on the merits ... was based on an unreasonable determination of the facts, we evaluate the claim de novo, and we may consider evidence properly presented for the first time in federal court.").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was

incorrect but whether that determination was unreasonable—a substantially higher threshold."). State court factual findings are presumed to be correct and are binding on the federal court unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to, or an unreasonable application of Supreme Court precedent or by establishing that the state court's factual findings were unreasonable—then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision. *Hurles*, 752 F.3d at 778.

When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court as well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167-68. Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d at 1000.

**2.      Clearly-Established Law Governing Ineffective Assistance Claims**

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The standard

for IAC claims was set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A petitioner must establish both deficient performance and prejudice to prove an IAC claim. *Id.* at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one prong is not satisfied and would compel denial of the IAC claim. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best

> criminal defense attorneys would not defend a particular
> client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete
> investigation are reasonable precisely to the extent that
> reasonable professional judgments support the limitations on
> investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690-91. That is, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Further, counsel is not deficient in an area where an investigation would not have been fruitful for the defense.

The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." These cases are instructive in the Court's assessment of whether the state court reasonably applied *Strickland*. *See Duhaime*, 200 F.3d at 600. First, tactical decisions do not constitute IAC simply because, in retrospect,

better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

If a petitioner shows that counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86 at 112. Further, to

demonstrate prejudice when the IAC claim is based on counsel's failure to file a motion, the petitioner must show a reasonable probability that the motion would have been granted. *Gable v. Wengler*, No. 1:10-CV-00644-REB, 2013 WL 4097711, at *18 (D. Idaho Aug. 13, 2013) ("Even if trial counsel had made a timely motion to suppress, that motion would not have been granted, and Petitioner has thus failed to show he was prejudiced by trial counsel's failure to file a timely motion to suppress.").

The foregoing standard, giving deference to counsel's decision-making, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S. Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. That is, when evaluating an IAC claim under § 2254(d), this Court's review of that claim must be "doubly deferential." *Pinholster*, 563 U.S. at 190 (internal quotation marks omitted).

**3.     Russo Is Not Entitled to Habeas Relief**

For the following reasons, the Court concludes that Russo's three habeas claims

must be denied.

> **A.     *Trial Counsel Was Not Ineffective for Failing to File a Pretrial Motion to Exclude Dr. Minge's Identification***

In Claim 1, Russo alleges that his trial counsel rendered ineffective assistance in

failing to file a pretrial motion to exclude Dr. Minge's identification of the victim as the

woman in the cell phone video. Although most of Dr. Minge's testimony was lay

testimony—she simply identified the victim's external genitalia in the cell phone video

due to her knowledge of the victim's body—the prosecution seemed to steer Dr. Minge,

at the end of her direct testimony, toward the territory of expert testimony:

> Q.     So when you're conducting this pelvic exam on [the victim], can you describe what her female pelvic area looks like for the jury?
>
> A.     She has a normal female genitalia. The—notably absent any public hair, which is consistent with shaving or waxing. She has a markedly defined prepuce, which is unique to most patients. It is different in her. Otherwise, everything is normal in appearance.
>
> Q.     Okay. Are there any other distinct features about her pelvic area?
>
> A.     She has a very distinctive crease. All people have permanent skin creases in different locations. All people have one on the lower abdomen, which would be above the mons [pubis].… That's a permanent lateral crease. But she also has a very distinctive crease that wraps around the mons and is unusual.
>
> Q.     Unusual for most females?

A.      Right.

Q.      Are there any other distinctive marks or any indicators of her?

A.      She has two—a C-section scar times two. So that's in her lower abdomen, and a mole right off to the left side of that. She also has a significant tattoo on her lower abdomen here. And at the time of the exam, a belly button ring as well. And then, those are the most significant features of her genitalia.

….

Q.      Doctor, I'm going to show you what's been admitted into evidence as State's Exhibit 49 [the video recovered from Russo's cell phone]. If you have your fancy little laser pointer—

So Doctor, as I play this, I know it's very quick, as the video's playing, if you could highlight what you see.

A.      Okay, sure.

Again, the larger than average prepuce of the clitoris. Off to the side right here, you can see the crease that comes around the top of the mons that was clearly evident in the photos. Up here, you can also see the two lines. So this was the one from the C-section. And then, the one below it was her permanent crease. That, I don't feel, shows anything significant.

Q.      Thank you.

And that, you compared with photographs, Doctor?

A.      Yes.

Q.      And Doctor, after your review of the photographs in relationship to the video and those still photos, can you make a determination *beyond a degree of medical certainty whose pelvic region the female's in that video is?*

(State's Lodging A-12 at 86-92 (emphasis added).) At this point, defense counsel objected that Dr. Minge was not "qualified to make this opinion testimony." (*Id*. at 93.) The trial court overruled the objection.

The prosecutor asked the doctor again if she could identify the woman in the video "beyond a degree of medical certainty," and Dr. Minge answered, "I believe it's [the victim]." (*Id*. at 94.) The "medical certainty" language arguably moved Dr. Minge's testimony from that of a fact or lay witness into an area of expert testimony.

Russo asserts that his counsel should have moved before trial to exclude Dr. Minge's expert testimony. The Idaho Court of Appeals rejected this claim, because Russo had not shown that the identification probably would have been excluded as improper expert testimony. That is, any such motion would have been denied and, therefore, no prejudice resulted from counsel's failure to file one:

> Russo argues that the trial court, in a pretrial hearing, regarded the victim's doctor as primarily a fact witness for the purposes of trial, and thus Russo's trial counsel should have filed a motion in limine to exclude expert testimony from the victim's doctor as to the identification of the female in the video at trial. Russo concludes that, had his trial counsel properly excluded such testimony prior to trial, the State would not have been allowed to present the doctor's prejudicial identification testimony and Russo would not have been found guilty. Even assuming the accuracy of Russo's allegation, his claim failed to allege on what basis the expert testimony of the victim's doctor would have been excluded. Russo's claim is impermissibly conclusory. Consequently, Russo has failed to show that the district court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to file a motion in limine to exclude expert testimony from being offered by the victim's doctor.

(State's Lodging D-4 at 5.)

**MEMORANDUM DECISION AND ORDER - 17**

This decision of the Idaho Court of Appeals was not unreasonable under § 2254(d). Russo did not provide any basis upon which Dr. Minge's testimony should have been excluded. Instead, he simply assumed that Dr. Minge's identification was inadmissible expert testimony. Having failed to show any reason why Dr. Minge's identification was inadmissible, Russo failed to show prejudice from his trial counsel's failure to file a motion in limine.

Further, the Court concludes on de novo review that Russo's trial counsel made a reasonable strategic decision not to file a pretrial motion to exclude expert testimony by Dr. Minge. At a pretrial hearing, the trial court correctly characterized Dr. Minge as primarily a fact witness, stating that the defense would have to show a particular need for the court to appoint a defense expert to rebut Dr. Minge's identification:

> I think [Dr. Minge is] *largely a fact witness*. I'm not sure if you're going to have an opinion from the person, or if they're just going to say, look, I'm—this is—I'm the doctor, and I'm familiar with this person, and I do these examinations, and that—but *if there's an opinion, it's based on their factual person*. So I'm not saying I'm going to appoint a physician for the defense. There needs to be a showing that that is necessary.

(State's Lodging A-8 at 18-19 (emphasis added).) Defense counsel did not then request funding for a defense expert, presumably because Dr. Minge's anticipated identification of the victim was anticipated to be lay testimony.

It was reasonable for counsel not to file a motion to exclude the identification as expert testimony, because the trial court had already informed defense counsel that the court did *not* consider the doctor to be testifying as an expert. And once the prosecutor

asked Dr. Minge for an identification "beyond a degree of medical certainty"—

potentially approaching the realm of expert testimony—defense counsel objected.

To be clear, the Court does *not* conclude that Dr. Minge's identification, if

characterized as expert testimony, was inadmissible. In fact, Dr. Minge's testimony

regarding her credentials indicates that she easily could have qualified as an expert in

female anatomy. *See* Idaho R. Evid. 702 ("A witness who is qualified as an expert by

knowledge, skill, experience, training, or education may testify in the form of an opinion

or otherwise if the expert's scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a fact in issue."). The Court

simply concludes, on de novo review, that trial counsel's strategic decision not to file a

pretrial motion regarding Dr. Minge's expert qualifications was reasonable, given that the

trial court had already indicated that it considered her primarily a fact or lay witness.

For these reasons, Russo cannot meet either *Strickland* prong, whether considered

de novo or under § 2254(d), and he is not entitled to relief on Claim 1.

> **B.      *Trial Counsel Was Not Ineffective for Failing to Move for a Judgment of Acquittal***

In Claim 2, Russo alleges that trial counsel should have moved for a judgment of

dismissal or acquittal. Specifically, Russo asserts that Dr. Minge's testimony was

inconclusive and, therefore, the prosecution "failed to produce a proper and positive

identification to support its allegation that the cellphone video showed the Petitioner

raping the victim." (Dkt. 3-1, Att. B, at 4; *see also* State's Lodging D-4 at 5.)

A motion for judgment of acquittal under Idaho Criminal Rule 29 must be granted if "the evidence [presented at trial] is insufficient to sustain a conviction." I.C.R. 29(a). Evidence is sufficient to support a conviction if, "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Adamcik*, 272 P.3d 417, 432 (Idaho 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Court need not decide if the Idaho Court of Appeals' rejection of Claim 2 was unreasonable under § 2254(d)(1) or (2) because, on de novo review, the Court concludes that a reasonable juror could have found Russo guilty beyond a reasonable doubt. Specifically, taking all the evidence in the light most favorable to the state, a rational juror could have concluded, based on Dr. Minge's testimony, that the victim was the woman in the cell phone video. The identification, made by a doctor familiar with the victim's genitalia and supported by specific and individualized characteristics—such as the unusually large prepuce, the two C-section scars, and the crease wrapping around the mons pubis—constituted more than sufficient evidence from which a reasonable juror could have concluded that the victim was the woman in the video.

Besides Dr. Minge's identification, circumstantial evidence also supported a finding that the woman in the video was the victim. The victim testified she could tell that the rapist was using a cell phone camera during the rape: "He had a—and I could hear his cell—a cell phone flip open. And I heard the flash and I saw like the light. Because the pillow was over my head, but my face was facing to the right, so I saw my

room. And so I saw a flash, so I assumed he took a picture." (State's Lodging A-11 at 214.) Russo recorded the video on his cell phone on August 27, 2009, the morning of the rape, at 3:59 a.m. (*Id.* at 501.) And the victim testified that, sometime after she heard the cell phone "clicking," she looked at her alarm clock and noted that it was 4:14 a.m. (*Id.* at 217.) Finally, Russo admitted that he did not inform Detective Weekes during his interview that he had an alibi witness named Melissa or Michelle. He testified that, even though he knew he was being investigated for rape, he did not think it would be beneficial for him to tell Detective Weekes that he was with someone else at the very time the rape occurred; he also stated he believed at the time that this consensual sexual encounter was none of Weekes's business. (State's Lodging A-12 at 126-28.)

Therefore, the jury heard evidence of the following: (1) the victim's rapist used his phone to record the rape, (2) the video was found on Russo's cell phone, (3) Russo recorded the video at the time of the rape, and (4) Russo did not inform the investigating officers about his alleged alibi, allowing for a reasonable inference that the story of the mysterious Melissa or Michelle was recently fabricated. Considering this evidence in the light most favorable to the prosecution, along with the testimony of Dr. Minge—who was familiar with the victim's external genitalia and, due to that familiarity, identified her as the woman in the video—a rational juror could have found Russo guilty beyond a reasonable doubt. Therefore, a Rule 29 motion would have been denied, and Russo cannot show prejudice from trial counsel's failure to file such a motion.

### C. Appellate Counsel Was Not Ineffective for Failing to Argue that the Trial Court Erred in Overruling Trial Counsel's Mid-Trial Objection to Dr. Minge's Identification

In Claim 3, Russo asserts that his direct appeal counsel rendered ineffective assistance by failing to appeal the trial court's decision to overrule trial counsel's objection, during Dr. Minge's testimony, that Dr. Minge was not qualified to give her opinion that the woman in the video was the victim.

The principles from *Strickland* set forth above apply both to claims of ineffective assistance of trial counsel and to claims of ineffective assistance of direct appeal counsel. Additionally, there is specific federal precedent regarding constitutionally-effective appellate advocacy. Effective legal assistance on appeal does *not* mean that appellate counsel must appeal every question of law, or even every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "Nothing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client." *Id.* at 754. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751-52.

Therefore, although it is "possible to bring a *Strickland* claim based on [appellate] counsel's failure to raise a particular claim, … it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). A petitioner can show deficient performance of appellate counsel only when counsel failed to raise a

nonfrivolous issue that "was clearly stronger than [the] issues that counsel did present."

*Id.*

      To show prejudice with respect to direct appeal counsel's failure to challenge an

alleged trial error, a petitioner must show (1) that the error was obvious from the trial

record and (2) a reasonable probability that appellate consideration of the issue would

have resulted in reversal. *Miller v. Keeney*, 882 F.2d 1428, 1434 and n.9 (9th Cir. 1989).

If a petitioner does not do so, he cannot satisfy either prong of *Strickland*—appellate

counsel was not ineffective for failing to raise a weak issue, and the petitioner suffered no

prejudice as a result of it not having been raised. *Id.* at 1435.

      The Idaho Court of Appeals rejected Claim 3 because Russo did not show that

appellate counsel performed deficiently, nor did he show a reasonable probability that a

challenge to the trial court's decision to overrule the objection would have succeeded on

appeal:

> Russo claims it was improper when the testimony of the
> victim's doctor shifted from being that of a fact-witness to
> that of an expert but cites no authority to support the
> contention. Russo also asserts that the issue was meritorious
> given the trial court's previous rulings regarding the doctor's
> testimony as being a fact witness. In support, Russo states
> that, "if this was a meritorious issue then it is necessarily
> stronger than the ones raised which were all rejected by the
> [Idaho] Supreme Court when it affirmed [Russo's]
> conviction." Such an assertion is conclusory and fails to
> demonstrate why this issue was stronger than the issues which
> were raised on direct appeal. Furthermore, there is no reason
> to assume that, because Russo's issues raised on appeal were
> unsuccessful, other issues must have been meritorious.
> Moreover, even presuming the issue was meritorious, Russo
> has failed to show that the doctor's testimony was legally

>impermissible requiring the trial court to sustain trial counsel's objection, much less that such an argument would have prevailed on direct appeal had appellate counsel raised the issue. Russo's conclusory allegations are insufficient to overcome the strong presumption of effective assistance of appellate counsel.

(State's Lodging D-4 at 7 (alterations in original).)

The double deference that applies when reviewing ineffective assistance claims in habeas proceedings leaves no room for this Court to second-guess the tactical decision of Russo's direct appeal counsel with the benefit of hindsight. *Pinholster*, 131 S. Ct. at 1403; *Strickland*, 466 U.S. at 689. The two issues direct appeal counsel raised—that the cell phone should have been suppressed under the Fourth Amendment and that evidence of Russo's deviant sexual interests was inadmissible under Rule 404(b)—were stronger than the argument regarding Dr. Minge's identification. Therefore, Russo has not shown that appellate counsel performed deficiently by choosing not to challenge the trial court's decision to allow Dr. Minge's identification.

Moreover, Russo cannot show a reasonable probability of success on appeal had appellate counsel raised the issue. As the Court already noted with respect to Claim 1, Russo has not set forth any basis upon which Dr. Minge's identification—even if it is deemed to be expert testimony—was excludable. Further, as Respondent accurately points out, all of Dr. Minge's testimony prior to the question regarding a degree of medical certainty was undoubtedly factual, not expert, testimony: "Th[e] final question, and Dr. Minge's answer to it, merely summarized Dr. Minge's testimony." (Dkt. 17 at 9.) Therefore, even if the answer to that final question was improper, the remainder of Dr.

Minge's testimony—in which she identified various portions of the genitalia of the woman in the video as being consistent with the victim's genitalia—would have remained unaffected. Thus, Russo has not shown prejudice, and the Idaho Court of Appeals did not unreasonably reject Claim 3.

## CONCLUSION

For the foregoing reasons, Russo's habeas petition will be denied.

## ORDER

**IT IS ORDERED:**

1.    The Petition for Writ of Habeas Corpus (Dkt. 3) is DENIED, and this entire action is DISMISSED with prejudice.

2.    The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.

DATED: June 19, 2019

Honorable Candy W. Dale
United States Magistrate Judge